UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| **Classic Maritime Inc,** § | |
| § | |
|     **Plaintiff,** § | |
| § | Case No. 1:21-cv-00083 |
| v. § | |
| § | Admiralty Rule 9(h) |
| **XCoal Energy and Resources LLC** § | |
| **D/B/A/ XCoal Energy and Resources** § | |
| § | |
|     **Defendant.** § | |

**REPLY IN FURTHER SUPPORT OF PLAINTIFF'S APPLICATION
FOR ISSUANCE OF A WRIT OF MARITIME ATTACHMENT**

Plaintiff, Classic Maritime Inc. ("Classic" or "Plaintiff"), by and through its attorneys, Holland & Knight LLP, submits this Reply Memorandum of Law in Further Support of Plaintiff's Application for Issuance of a Writ of Maritime Attachment, and in response to the opposition filed by defendants XCoal and Energy and Resources LLC d/b/a XCoal and Energy and Resources ("XCoal" or "Defendants") (Dkt. # 4) (the "Opposition" or "Opp.").

The requirements for obtaining a Rule B attachment are well stated and undisputed. To obtain a Rule B attachment the Plaintiff must show only that:

1.     it has a valid *prima facie* admiralty claim against the defendant;

2.     the defendant cannot be found within the district;

3.     the defendant's property may be found within the district; and

4.     there is no statutory or maritime law bar to the attachment.

*See e.g., Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 51 (2d Cir. 2008); *Blue Whale Corp. v. Grand China Shipping*, 722 F.3d 488, 493 (2d Cir. 2013); *Tradhol Internacional, S.A. v. Colony Sugar mills Ltd.*, 354 F. App'x 463, 464 (2d Cir. 2009).

XCoal does not make reference to any of the specific Rule B requirements in its opposition.[1] Rather, in opposition XCoal presents arguments concerning the merits of Classic's claim related to XCoal's breach of the COA.[2] Specifically, XCoal argues that (1) freight was not earned, and is not due or owing for the missed shipments XCoal was obligated to provide under the COA because the cargo was never loaded, (2) alternatively, Classic fully mitigated its damages by employing its vessels in other trades, and (3) to the extent XCoal did breach the COA, such breach is excused by *force maje*ure resulting from the COVID 19 pandemic. Opp. at 1-4.

XCoal's arguments are not relevant to any of the requirements for obtaining a Rule B attachment. Rather, XCoal's arguments all relate to the merits of Classic's claim and damages, and XCoal's own affirmative defense. As XCoal has acknowledged and concedes, however, that Classic's claims are subject to New York arbitration pursuant to the terms of the COA, which arbitration has been commenced. Opp. at 4, Ver. Compl. (Dkt. # 1) ¶ 12; Memo at 2. Thus, the pending NY Arbitration is the only proper forum to litigate the merits of Classic's claims and XCoal's defenses.

---

[1] In fact, XCoal's opposition is devoid of reference to any authorities whatsoever, except a passing reference to Supplemental Rule E(8) to confirm its restricted appearance in this matter. In support of its arguments, however, XCoal does not cite to a sing case, statue, or rule – not even Rule B. This is because, as will be demonstrated herein, there are no authorities to support XCoal's opposition to Classic's Rule B Application.

[2] "COA" refers to the parties contract of affreightment dated December 2, 2019. *See* Ver. Comp. ¶ 7.

Classic submits that all of the Rule B requirement have been meet. Accordingly, and for all of the reasons set forth below and in Classic's Verified Complaint (Dkt. #1) ("Ver. Compl."), the Declaration of James Power (Dkt. 3-1)("Power Decl."), and Classic's Memorandum of Law in Support of Rule B Attachment (Dkt. 3) ("Classic's Memo") (collectively, the "Rule B Application"), the Court should issue the requested order of attachment directing the issuance of a writ of attachment and garnishment against the Defendants.

    **A.**    **Classic Has Asserted a Valid *Prima Facie* Admiralty Claim Against XCoal.**

Viewed in the most charitable light possible, XCoal's arguments could be construed as an attempt to argue that Classic has failed to state a valid *prima facie* admiralty claims. But even when viewed in that light, XCoal's arguments are misplaced and misconstrues the *prima facie* claim standard under Rule B.

    1.    *The Rule B Prima Facie Standard*

The *prima facie* standard under Rule B does not require the Court to evaluate the merits of a plaintiff's claim. Rather the *prima facie* standard is satisfied if the complaint merely demonstrates that the plaintiff has a claim that is "cognizable in admiralty [i.e.] … one which will support a finding of admiralty jurisdiction." *Dolco Inv., Ltd. v. Moonriver Development, Ltd*. 486 F. Supp. 2d 261, 266 (S.D.N.Y. 2007) (quoting *Winter Storm Shipping. Ltd. v. TPI*, 310 F.3d 263, 268 (2d Cir. 2002)); *see also Wilhelmsen Premier Marine Fuels AS v. UBS Provedores Pty Ltd.*, 519 F. Supp. 2d 399, 409 (S.D.N.Y. 2007) ("under [the Rule B *prima facie* standard], the Court looks only to the Complaint to determine whether the plaintiff has alleged a valid admiralty claim against the defendant"). At the pre-attachment phase, the court must first determine that the claim

3

is an admiralty claim. *See Al Fatah Intern. Nav. Co. Tld. V. Shivsu Canadian Clear Waters Technology*, 649 F. Supp. 2d 295, 298 (S.D.N.Y. 2009).

XCoal does not dispute that Classic claim for breach of the COA is a quintessential admiralty claim. *See* Classic's Memo at p. 4 (citing *Morewood v. Enequist*, 64 U.S. 491, 494-95 (1859) ("charter-parties and contracts of affreightment are 'maritime contracts' within the true meaning and construction of the Constitution and act of Congress"); *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 23 (2004) (confirming that cases involving maritime contracts give rise to admiralty jurisdiction)).

Next, "the court must determine that the claim is facially sound, that is, that the claim is, on its face and without investigation, sound or well-founded." *Al Fatah Intern. Nav. Co.*, 649 F. Supp. 2d at 298. Courts should not conduct a trial on the merits at this stage of the proceedings and the plaintiff need not provide its claim to obtain an attachment order. *Transportes Navieros y Terrestes v. Fairmount Heavy Transp. N.V.*, 07-cv-3076, 2007 WL 1989309, at *4 (S.D.N.Y. July, 6 2001). While *some* sort of inquiry into the merits may be required to ensure that a defendant's funds are not attached arbitrarily, that inquiry is performed at the motion to vacate stage pursuant to Rule E(4)(f),[3] which rule "is designed to satisfy the constitutional requirement of due process by guaranteeing to the [defendant] a prompt post-seizure hearing at which he can attack the complaint, … the security demanded, or any other alleged deficiency in the proceedings." *Al*

---

[3] Supplemental Admiralty Rule E(4)(f) states, in relevant part:

> Whenever property is arrested or attached, any person claiming an interest in shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated … .

4

*Fatah*, 649 F. Supp. 2d at 298-99 (quoting Supp. Rule E, Advisory committee's notes (1985 amendment))(citing *Winter Storm Shipping,* 310 F.3d at 272). At a post-attachment Rule E(4)(f) hearing, the inquiry into the merits of the underlying claim is limited to determining whether the claim "is facially sound or well-founded". *Id*. The plaintiff's verified complaint must merely contain factually allegations that meet that meet Rule E(2)(a)'s pleading standard by "stat[ing] the circumstances from which the claim arises with such particularity that the defendant …will be able … to commence an investigation of the facts and to frame a responsive pleading." *Padre Shipping, Inc. v. Yount He Shipping*, 559 F. Supp. 2d 328, 332 (2008)(quoting Rule E(2)(a)).

Classic submits that the standard is even less burdensome at the pre-attachment stage, as is the posture in this Action. Pursuant to Rule B(1)(b), "The court must review the complaint and affidavit and, if the conditions of this Rule B appear to exist, enter and order so stating and authorizing the process of attachment and garnishment." *See also Heidmar, Inc. v. Amomina Ravennate Di Armanento Sp.A of Revenna*, 132 F.3d 264, 267 (5th Cir. 1998)

Classic's Verified Complaint set forth in its allegations all the elements of a valid *prima facie* breach of maritime contract claim. Classic alleges that it and XCoal entered into a COA on December 2, 2019, and that the COA obligated XCoal to provide 800,000 tons of coal (or 7 shipments). Ver. Compl. ¶ 7 & 18. Classic further alleges that XCoal breached the COA by failing to provide the full allotment of coal (and only 2 out of the contemplated 7 shipments). Ver. Compl. ¶ 18. "As a result of XCoal's breach of the COA, Classic was damaged in the amount approximately $1,017,952 per voyage for each of the 5 remaining voyages (approximately USD $5,089,760 in total) that were required by the COA, but were never performed." Ver. Compl. ¶ 20.

XCoal does not dispute that these allegations are sufficient on their face to satisfy the Rule B valid *prima facie* admiralty claim standard.

>   2.  *XCoal's Arguments Are Not Germaine To The Rule B Prima Facie Standard And Are Otherwise Meritless*
>
>       (i)  *Classic's Claim For Breach Of the COA is Not a Claim for Unpaid or Outstanding Freight*

In opposition, XCoal does not dispute the existence of the COA, or that it was obligated under the COA to provide enough coal for 7 shipments, or that it breached the COA by failing to provide enough coal for 7 shipments. Rather, XCoal argues that pursuant to the AMWELSH (1979) charter party form under which individual voyages under the COA were to be performed freight is not earned until the cargo is loaded onboard the vessel. Opp. at 1-2. Therefore, XCoal argues, no freight was due and owning for the 5 missing shipments that it failed to provide. This argument completely misconstrues the nature of Classic's claim.

Classic's claim with respect to the missing shipments is a claim for the breach of Xcoal's obligations under the COA. It is not a claim for freight earned or outstanding arising under a specific voyage charter performed under amended AMWELSH (1979) charter party form. Indeed, Classic has asserted outstanding freight claims in the Verified Complaint related to a number of voyages that were performed under the AMWELSH (1979) charter party form (both performed under the COA, and other voyages that were not), which claims XCoal apparently do not take issue with in its opposition. Ver. Compl. 11, 13-16, & 21-22. Conversely, Classic's claim for breach of the COA relates to damages resulting from XCoal's failure to provide the full cargos and the total number of shipments it was obligated to provide under the terms of the COA. This claims

does not implicate the freight payment clause under the AMWELSH (1979) charter party form because the voyages never were performed due to XCoal's breach of the COA.

This case is no different than any other breach of contract case. For a breach of contract, the traditional rule of damages seeks to place the non-breaching party in the same economic position it would have had if the contract had been performed. *See e.g.*, 24 Williston on Contracts § 64:1 (4th ed.); J. Calamari & J. Perillo, *The Law of Contracts* 521 (2d ed. 1977). When this rule is applied to a charterers' failure to supply cargos under a contact of affreightment or a charter party agreement the proper measure of damages is the net amount the vessel would have earned under the contract if contract had performed. *See e.g., Aaby v. States Marine Corp.,* 107 F. Supp. 484, 486 (S.D.N.Y. 1951) (citing the Gazelle, and Cargo, 128 U.S. 474, 487 (1888)). That is exactly the claim for damages that Classic has asserted in its Verified Complaint. Had XCoal performed as obligations under the COA, the net amount Classic would have earned is approximately $1,017,952 per voyage for each of the 5 missing voyages (approximately $5,089,760 in total). Ver. Compl. ¶¶ 10 -20.

Furthermore, XCoal's arguments raises issue with respect to the interpretation of the parties' contracts, which issue – XCoal acknowledges - is to be decided in the pending NY Arbitration. Based on the allegations in the Verified Complaint, Classic has stated a valid *prime facie* admiralty claim under Rule B for breach of the COA.

*(ii)*     *Classic's Mitigation Efforts*

XCoal next raises issues with respect to Classic's mitigation of damages. Specifically, XCoal argues that Classic was "obligated to mitigate its damages by seeking and obtaining substitute employment for its vessels," and that "[b]ased upon information and belief," Classic did employ its vessels in other trades. XCoal further "believes" that other employment was more lucrative, and thus Classic has not suffered any damages resulting from XCoal's failure to provide cargo for the 5 missing shipments under the COA. Opp. at 2 – 3.

XCoal's argument raises several highly speculative factual issues – issues that are strongly disputed by Classic – that go far beyond the allegations asserted in the Verified Complaint and the scope of this Court's review under the Rule B *prima facie* claim analysis. The mitigation issues raised by XCoal concern the merits of Classic's claims for damages for breach of the COA, and not whether Classic's claim is facially valid. Furthermore, issues concerning Classic's mitigation of damages will be addressed in the pending NY Arbitration and should not be litigating in this Action in determining whether the conditions for a Rule B attachment have been satisfied. *See e.g., Padre Shipping,* 599 F. Supp. 2d at 3323 (finding that plaintiff met the *prima facie* standard under Rule B where "the Complaint states a facially valid claim for breach of maritime contact," and refusing to resolve merit related issues finding that those issues were more properly resolved in litigation pending in another forum).

It should further be noted that, even if Classic did employ its vessels in other trade, New York arbitrators have found that under a contract of affreightment a claimant may still be entitled to lost revenue the vessel would have earned under the breached agreement if by use of its owned or chartered vessels the claimant could have performed both trades. *See In re Arbitration between*

8

*Alumina Transport Corp. and Occidental Chem. Co.*, SMA No. 2136, 1985 WL 1095307, at *7 (1985). This demonstrates the point that XCoal's mitigation arguments, even when viewed in the most favorable light, do not in any way establish that Classic will not or could not obtain an award for the full amount of damages it seeks for its claim.

### (iii) Force Majeure is an Affirmative Defense And is Not Germaine to the Rule B Analysis

Finally, Xcoal argues that the *force majeure* clauses in the AMWELSH (1979) charter party excuses its breach of the COA because its failure to provide shipments was a result of the pandemic. Opp. Memo at 3-4. XCoal's own argument, however, establishes that the pandemic did not actually prevent it from performing under the COA. Rather, due to the economic conditions related to the pandemic XCoal's buyer, POSCO, declined to purchase XCoal's cargo. As unfortunate as the may have been for XCoal, it does not amount to *force majeure*. Opp. at 4. In general, the basic purpose of a *force majeure* clause is to relieve a party from its contractual duties when its performance has been directly prevented by a force beyond its control. *See e.g., Nissho-Iwai Co., Ltd v. Occidental Crude Sales, Inc.*, 792 F.2d 1530, 1540-42 (5 th Cir. 1984). XCoal's buyers' refusal to buy its cargo for economic reasons is not such a force, and the pandemic did not directly prevent XCoal's performance of the COA.

Furthermore, *force majeure* is an affirmative defense, and XCoal has the burden of proving that a *force majeure* event occurred and demonstrating that it made sufficient efforts to perform its contractual duties despite the occurrence of the event it claims constituted *force majeure*. *Id*.; *see also Phillips Puerto Rico Core, Inc. v. Tradax Petroleum Ltd*, 782 F.2d 314, 319 (2d Cir. 1985). A defendants affirmative defense is not in any way germane to the Rule B *prima facie* claim

analysis. In any event, as with XCoal's other arguments, XCoal *force majeure* argument presents an issue to be decided in the NY Arbitration.

### B. XCoal Does Not Dispute that All of the Other Requirements for Obtaining a Rule B Attachment Have Been Met

In addition to demonstrating that it has a valid *prima facie* admiralty claim against XCoal, Classic has in its Rule B Application satisfied the remaining requirements for obtaining a Rule B attachment by showing that XCoal cannot be found within the district, XCoal's property may be found within the district, and there is no statutory or maritime law bar to the attachment. Classic's Memo, pp. 4-6. In its opposition XCoal does not dispute that these requirements have been satisfied. Accordingly, Classic submits that all of the requirements for obtaining a Rule B attachment have been established in its Rule B Application.

### CONCLUSIONS

Accordingly, and for all of the reasons set forth below and in Classic's Rule B Application, the Court should issue the requested order of attachment directing the issuance of a writ of attachment and garnishment against the Defendants.

Dated: February 8, 2021
      Houston, Texas

                                  Respectfully submitted,

                    By:    *s/ James H. Power*
                           Julia M. Haines
                           State Bar. No. 08710800
                           Fed I.D. No. 00765
                           James H. Power
                           State Bar No. 24026397
                           Federal I.D. No. 433050

HOLLAND & KNIGHT LLP
1100 Louisiana Street Suite 4300
Houston, Tx 77002
Telephone (Cell): (713) 805-0684
Office: (713) 244-6875

- and –

31 West 52nd Street
New York, NY 10019
Telephone:  (212) 513-3200
Facsimile:  (212) 385-9010
Email: james.power@hklaw.com

*Counsel for Classic Maritime Inc.*